1
Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2
2901 W. Coast Hwy., Suite 200
3
Newport Beach, CA 92663
Office: (949) 270-2798
4
Email: rnathan@nathanlawpractice.com

5

Ross Cornell, Esq. (SBN 210413)
6
**LAW OFFICES OF ROSS CORNELL, APC**
7
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
8
Office: (562) 612-1708
9
Email: rc@rosscornelllaw.com

10

Attorneys for Plaintiff: JOHN JANIGA
11
                    **UNITED STATES DISTRICT COURT**
12
                    **CENTRAL DISTRICT OF CALIFORNIA**
13

14
JOHN JANIGA, on behalf of himself         Case No:
15
and all similarly situated persons,

16
                    Plaintiff,            **COMPLAINT**

17
                                          1. Cal. Penal Code § 638.51
v.
18                                        2. Cal. Penal Code § 631
                                          3. Cal. Bus. & Prof. Code § 17200, *et seq.*
19
VIVID SEATS INC., a Delaware
corporation; VIVID SEATS LLC, a
20
Delaware limited liability company,       **CLASS ACTION**
21
                    Defendant.
22

23

24

25

26

27

28

1

# I.    <u>NATURE OF THE ACTION</u>

1.    Defendants VIVID SEATS INC., a Delaware corporation and VIVID SEATS LLC, a Delaware limited liability company (collectively referred to herein as "Defendant" or "VIVID") own and operate a website, www.vividseats.com (the "Website").

2.    This is a class action lawsuit brought by Plaintiff on behalf of himself and on behalf of all California residents who have accessed the Website.

3.    Plaintiff JOHN JANIGA files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant. Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

4.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded or a user performs a tracked action.

5.    When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.    When users visit the Website, Defendant causes tracking technologies to be installed, executed, embedded, or injected in visitors' browsers. These include, but are not limited to, the following:

- Google Ads/DoubleClick Tracker
- Facebook Pixel Tracker
- Twitter Tracker
- Segment Tracker
- FullStory Session Replay Tracker

///

CLASS ACTION COMPLAINT

7.      The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial gain.  The above-listed trackers are referred to herein collectively as the "Trackers."

8.      The Trackers are operated by distinct third parties: Google LLC (Google Ads / DoubleClick Tracker); Meta Platforms, Inc. (Facebook Pixel Tracker); Twitter, Inc. (Twitter Tracker); Segment.io, Inc. (Segment Tracker); and FullStory, Inc. (FullStory Session Replay Tracker) (collectively the "Third Parties"). Defendant enables these trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data monetization activities.

9.      Through the Trackers, the Third Parties collect detailed user information including IP addresses, browser and device type, screen resolution, operating system, pages visited, session duration, scroll depth, mouse movements, click behavior, referring URLs, unique identifiers (such as cookies and ad IDs), and geolocation based on IP. This information is used for behavioral profiling, ad targeting, cross-device tracking, and participation in real-time advertising auctions (collectively, "User Information").

10.     Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other non-content metadata, they function as "pen registers" and/or "trap and trace devices" under Cal. Penal Code § 638.50. These tools silently collect routing and addressing information for commercial use without user interaction, as defined in *Greenley v. Kochava, Inc*., 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11.     Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way.  By installing and using

CLASS ACTION COMPLAINT

the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

12.    By installing and activating the Trackers without obtaining user consent or a valid court order, Defendant violated California Penal Code § 638.51, which prohibits the use of pen registers and trap and trace devices.

13.    Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

14.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    PARTIES

15.    Plaintiff JOHN JANIGA ("Plaintiff") is a California citizen residing in San Bernardino County and has an intent to remain there.  Plaintiff was in California when he visited the Website, which occurred during the class period prior to the filing of the complaint in this matter.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

16.    Defendant VIVID SEATS INC. is a Delaware corporation that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

17.    Defendant VIVID SEATS LLC is a Delaware limited liability company that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

18.    VIVID  is a leading online ticketing marketplace focused on live events, including concerts,  sports,  and  theater performances.  The  company maintains  a strong digital presence in the United States and operates its primary consumer platform at www.vividseats.com. Headquartered at 24 E. Washington Street, Suite 900, Chicago, Illinois, Vivid Seats enables users to browse and purchase tickets to thousands of events from independent sellers nationwide.

/ / /

CLASS ACTION COMPLAINT

19.     Vivid Seats functions as the flagship consumer-facing brand of VIVID's broader ticketing ecosystem. While the company supports a variety of seller tools and event services, the platform is directly responsible for facilitating ticket transactions, processing customer payments, and managing communications between buyers and sellers. In the course of operating its online marketplace, VIVID collects and processes user data for purposes including behavioral analysis and digital advertising.

20.     The Website serves as VIVID's primary digital storefront.  It allows users to explore event listings, save favorites, manage accounts, and complete ticket purchases. In addition to these marketplace functions, the Website also operates as a behavioral tracking and advertising platform. Through the deployment of third-party tracking technologies, including advertising pixels, event tracking scripts, behavioral monitoring tools, and data brokering integrations, VIVID collects detailed data about user interactions with the site. These data practices form a core component of VIVID's performance marketing, ad-targeting, and audience monetization strategy.

## III.     **JURISDICTION AND VENUE**

21.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

22.     This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website.  Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

23.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has

CLASS ACTION COMPLAINT

1  intentionally availed itself of the laws and markets within this District; (2) does

2  substantial business within this District; (3) Plaintiff resides within this District; and (4)

3  the injury to Plaintiff occurred within this District.

## IV.    <u>GENERAL ALLEGATIONS</u>

### 1.    *The California Invasion of Privacy Act (CIPA)*

24.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a
legislative measure designed to safeguard the privacy rights of California residents by
prohibiting unauthorized wiretapping and eavesdropping on private communications.
The California Legislature recognized the significant threat posed by emerging
surveillance technologies, stating that "the development of new devices and techniques
for the purpose of eavesdropping upon private communications … has created a serious
threat to the free exercise of personal liberties and cannot be tolerated in a free and
civilized society" (Cal. Penal Code § 630).

25.    CIPA specifically prohibits the installation or use of "pen registers" and
"trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

26.    A "pen register" is defined as a device or process that records or decodes
dialing, routing, addressing, or signaling information transmitted by an instrument or
facility from which a wire or electronic communication is transmitted, excluding the
contents of the communication (Cal. Penal Code § 638.50(b)).

27.    Conversely, a "trap and trace device" captures incoming electronic or
other impulses that identify the originating number or other dialing, routing, addressing,
or signaling information reasonably likely to identify the source of a wire or electronic
communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

28.    In practical terms, a pen register records outgoing dialing information,
while a trap and trace device records incoming dialing information.

29.    Historically, law enforcement has utilized these devices to monitor
telephone calls, with pen registers recording outgoing numbers dialed from a specific
line and trap and trace devices recording incoming call numbers to that line.

CLASS ACTION COMPLAINT

30.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line— essentially capturing the user's outgoing information.

31.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line— capturing the incoming information.

32.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

33.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); Eichenberger v. ESPN, Inc., 876 F.3d 979, 983 (9th Cir. 2017).)

34.    Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. (See *Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).)

35.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

/ / /

CLASS ACTION COMPLAINT

1

**2.**    ***The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

2

36.    When the Plaintiff and Class Members accessed the Website, their

3

browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts

4

the content and functionality of the site. In response, the server transmitted an HTTP

5

response containing the necessary resources including HTML, cascading style sheets

6

(CSS), JavaScript files, and image assets used by the browser to render and display the

7

webpage. These resources also included client-side scripts that initiate communication

8

with third-party services for analytics, marketing, and tracking purposes. ***Figure 1***

9

below illustrates sample HTTP requests.

10

***Figure 1***

11



17

37.    The server's response included third-party tracking scripts that were

18

executed by the Plaintiff's and Class Members' web browsers. These scripts, once

19

executed, initiate client-side functions that capture routing and behavioral metadata and

20

transmit this data typically via HTTPS requests to the servers of third-party tracking

21

vendors. These actions occur without visible indicators or user awareness. The

22

transmitted data, referred to as User Information, included identifiers such as IP

23

addresses, device characteristics, browser types, page navigation behavior, and unique

24

tracking cookies, all of which were used to profile users and facilitate targeted

25

advertising.

26

38.    The Trackers operate by initiating HTTP or HTTPS requests—using

27

either the GET or POST method from the user's browser to external servers controlled

28

by the Third Parties. These requests are triggered automatically during the page load

CLASS ACTION COMPLAINT

and by user interactions with the Website. They are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

39.    An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used via external geolocation services to infer a user's general location, including state, city, and in some cases, ZIP code.

40.    Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

41.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

42.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

/ / /

CLASS ACTION COMPLAINT

43.    A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

44.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

45.    Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

### 3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting*

46.    Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

47.    This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment,

fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

48.   When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint, especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

49.   The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

50.   In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

51.   The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website. These services also leverage user data collected from other websites that include the same pen register and trap and trace devices operated by the Third Parties.

/ / /

52.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header.  In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

### 4.     *Plaintiff's And Class Members' Data Has Financial Value*

53.     Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

54.     Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

55.     There is "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

56.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that

---

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

CLASS ACTION COMPLAINT

businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

57.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars.  Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

58.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

59.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a

---

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring  Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT

"misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5.** ***Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

60. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

61. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles may include information such as which users viewed specific products, engaged with pages or interface elements, or demonstrated purchase intent. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. The behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to re-engage high-intent visitors, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

62. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data such as IP address, device type, screen resolution, and referral information to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

63.     IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction.  IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

64.     When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device IDs, and cookies with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

### 6.  *The Trackers Function Together to Achieve Targeted Objectives*

65.     When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load.  These include client side scripts deployed by third party Trackers, specifically Google Ads and DoubleClick, Facebook Pixel, Twitter, Segment, and FullStory Session Replay, which begin collecting various categories of User Information without any visible indication to the user.  Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

CLASS ACTION COMPLAINT

66.    On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem. These entities leverage shared identifiers, cookie syncing, and cross device tracking techniques to follow users across websites, platforms, and environments. The tools are specifically engineered to build persistent consumer profiles, enabling real time behavioral targeting and identity resolution at scale.

67.    On the Website, a coordinated network of third party trackers is deployed to facilitate identity resolution, targeted advertising, and data monetization. This infrastructure includes trackers embedded directly in the page's HTML, such as Google Ads and DoubleClick and Facebook Pixel Tracker, which are activated immediately upon page load. Additional trackers, including Segment and FullStory Session Replay, are dynamically injected using JavaScript functions that execute during or shortly after the initial page load process. These technologies operate in tandem to collect and transmit user interaction data in real time, supporting downstream advertising, profiling, and data sharing operations.

68.    Identity resolution on the Website is primarily facilitated through the interplay of the Facebook Pixel Tracker and Segment Tracker. The Facebook Pixel Tracker identifies users by linking on site behavior to existing Facebook cookies and logged in sessions, correlating browsing activity with social media identities. The Segment Tracker contributes to identity resolution through behavioral segmentation and targeting logic designed to match users with audience categories in real time. These combined technologies enable vividseats.com to de anonymize users over time, correlate behaviors with known identities, and build detailed demographic and behavioral profiles.

69.    Once identity signals are gathered, targeted advertising and data monetization are executed through platforms such as Google Ads and DoubleClick, Facebook, Twitter, Segment, and FullStory Session Replay. These entities participate in real time bidding and programmatic advertising markets, enabling VIVID to auction

CLASS ACTION COMPLAINT

access to users based on behavioral and identity linked data. Google Ads and DoubleClick deliver performance based advertising by leveraging browsing behavior, conversion history, and demographic profiles to serve targeted creatives. Facebook and Twitter enable audience segmentation and campaign delivery based on user identities across social and content platforms. Segment and FullStory Session Replay facilitate deep behavioral tracking and audience analysis to enhance targeting and engagement strategies. Together, these trackers convert user interactions into marketable audience segments, driving measurable advertising outcomes and monetization for VIVID.

70. Defendant shares User Information with third party advertising platforms, including DoubleClick. These platforms operate real time bidding systems that auction ad space to the highest bidder using behavioral data collected from users during their visit to the Website. When a user loads the Website, data is immediately transmitted to DoubleClick and related ad services without any action or consent from the user. This includes the user's internet protocol address, browser type, device information, and the URL of the page visited. These identifiers enable advertisers to track users across websites, build behavioral profiles, and deliver personalized advertising in real time.

71. Network requests to DoubleClick's activity and view through conversion endpoints demonstrate Defendant's participation in an integrated advertising architecture that supports real time ad placement. This system enables advertisers to bid for ad impressions based on user characteristics, allowing Defendant to increase ad revenue by monetizing user attention. These exchanges serve no functional purpose for the user; their sole role is to maximize Defendant's advertising returns. By embedding tracking requests that operate silently and immediately on page load, Defendant treats personal data as a commodity for its own profit.

/ / /

/ / /

CLASS ACTION COMPLAINT

# V.     SPECIFIC ALLEGATIONS

***1.     Google Ads / DoubleClick Tracker***

72.     The Google Ads / DoubleClick Tracker is a digital advertising, behavioral tracking, and data brokering technology operated by Google LLC. It is designed to deliver display advertisements, measure engagement, and support real-time bidding on programmatic ad exchanges. The Google Ads / DoubleClick Tracker enables Google and its advertising clients to collect detailed user interaction data and optimize ad delivery across a vast network of third-party websites.

73.     When implemented on the Website, the Google Ads / DoubleClick Tracker collects a broad set of user metadata, including visited URLs, session timestamps, referrer headers, and in-page activity data such as page views and navigation events. It also captures technical device attributes such as IP address, screen resolution, browser type, operating system, and language settings. These data points are linked to persistent browser identifiers placed via cookies or pixel fires that allow Google to track users across multiple websites, sessions, and devices, forming longitudinal behavioral profiles. The Google Ads / DoubleClick Tracker also transmits conversion tracking signals and remarketing data, enabling Google to associate Website interactions with ad conversion events and to retarget users across its advertising ecosystem.

74.     The Google Ads / DoubleClick Tracker facilitates monitoring of user activity on the Website, including the capture of pageview events and other engagement signals that can be used to track user progression through various transactional flows. These interaction signals are transmitted to Google's ad infrastructure to facilitate targeted advertising, audience retargeting, and conversion tracking. The Google Ads / DoubleClick Tracker executes via JavaScript calls to domains including googleads.g.doubleclick.net and activates automatically upon page load without requiring any action by the user.

/ / /

75. The following figures [*Figure 2*, *Figure 3*, *Figure 4*] provide technical evidence of the Google Ads and DoubleClick Trackers being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to and/or connections with external tracking domains. These network events occurred automatically and without any user interaction, confirming that the tracking technologies were operating silently in the background without consent.

*Figure 2*



/ / /

/ / /

/ / /

/ / /

19

*Figure 3*



*Figure 4*



76.     Defendant surreptitiously installed, executed, embedded or injected the

Google Ads / DoubleClick Tracker onto users' browsers by embedding tracking scripts

20

in the Website's page source and by dynamically injecting additional JavaScript tracking code during runtime. When a user visits the Website, their browser automatically executes this code, which initiates outbound network requests to Google's advertising servers and transmits metadata including IP address, page URL, referrer information, device details, behavioral identifiers, and conversion tracking parameters as part of a third-party ad targeting, profiling, and data brokering system.

77.    The Google Ads / DoubleClick Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

78.    The Google Ads / DoubleClick Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

79.    The Google Ads / DoubleClick Tracker functions as a pen register and/or trap and trace device under the California Invasion of Privacy Act because it captures outgoing signaling data such as URLs visited, timestamps, and referrer headers and also processes incoming metadata such as ad impressions and cookie-based session identifiers. These transmissions occur automatically during page load and without user participation, enabling Google to continuously log user behavior and associate it with broader advertising profiles.

80.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Google Ads / DoubleClick Tracker on Plaintiff's and Class Members' browser or to collect or share data with Google.

81.    Consequently, the Google Ads / DoubleClick Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 2.    *The Facebook Pixel Tracker*

82.    The Facebook Pixel Tracker is a behavioral tracking script implemented through Meta's Pixel technology, typically delivered via domains such as

connect.facebook.net and facebook.com/tr/. On the Website, the Facebook Pixel Tracker is injected through tag management infrastructure. Once loaded, it initiates background communication with Meta's servers and enables real-time tracking of user activity.

83.    On the Website's homepage, the Facebook Pixel Tracker activates automatically upon page load and begins capturing behavioral data in real time. It records interaction signals such as page views and other engagement events without requiring any user action. The Facebook Pixel Tracker actively detects and collects additional user interaction, including click-based events and scrolling behavior. These signals are transmitted to Meta's servers and associated with the user's Facebook or Instagram profile, even if the user never directly interacts with any Meta service while on the Website.

84.    The data collected by the Facebook Pixel Tracker supports identity resolution by linking behavioral data from the Website with individual user profiles across Meta's platforms. If the user is logged into Facebook, Instagram, or Messenger on the same device or browser, the Facebook Pixel Tracker can tie Website behavior to the user's unique Meta ID. Even if not logged in, Meta can assign a persistent identifier using cookies, browser fingerprinting, or pixel fire data. This enables the creation of robust cross-site behavioral profiles based on a user's activity on the Website.

85.    The Facebook Pixel Tracker also serves VIVID's goal of targeted advertising by enabling the creation of "Custom Audiences," groups of users who have taken specific actions on the Website, such as browsing listings, viewing product pages, or beginning a checkout process. VIVID can then use Meta's Ads Manager to re-target those users across Facebook and Instagram, or to generate "Lookalike Audiences" that mirror the behavioral patterns of existing visitors. These mechanisms allow VIVID to efficiently deliver marketing content to users most likely to engage or convert.

86.    The Facebook Pixel Tracker contributes to VIVID's data monetization strategy by turning behavioral insights into measurable advertising ROI. The Facebook

CLASS ACTION COMPLAINT

Pixel Tracker generates real-time analytics regarding user behavior, campaign performance, and conversion attribution, which Meta then delivers to VIVID through its Ads infrastructure. This closed-loop feedback system connects on-site engagement with off-site ad delivery, allowing VIVID to refine ad spend, personalize messaging, and increase the value of each user interaction. In this way, the Facebook Pixel Tracker functions as a core part of VIVID's commercial surveillance infrastructure.

87.    The following figures [**Figure 5**, **Figure 6** and **Figure 7**] provide technical evidence of the Facebook Pixel Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to and/or connections with external tracking domains. These network events occurred automatically and without any user interaction, confirming that the tracking technologies were operating silently in the background without consent.

*Figure 5*



/ / /

/ / /

CLASS ACTION COMPLAINT

*Figure 6*



*Figure 7*



88.    Defendant surreptitiously installed, executed, embedded, or injected the Facebook Pixel Tracker onto users' browsers by dynamically injecting Meta's

24

JavaScript pixel through a tag management system such as Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Meta's servers and transmitting metadata including the user's page URL, referrer, browser configuration, and other session-specific details. These tracking operations occur without any user interaction, allowing Meta to collect data from users' sessions silently and without their consent.

89.    The Facebook Pixel Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

90.    The Facebook Pixel Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

91.    The Facebook Pixel Tracker captures and transmits routing, addressing, and signaling information  such as the user's page URL, referrer, and browser metadata to Meta's servers as soon as the page loads, without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the Website, allowing Meta to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Meta without authorization.

92.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Pixel Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

93.    Consequently, the Facebook Pixel Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 3.    *The Twitter Tracker*

94.    The Twitter Tracker is a behavioral tracking script implemented through

Twitter's tracking technology, typically delivered via domains such as twitter.com or platform.twitter.com. On the Website, the Twitter Tracker is inserted using tag management infrastructure. Once loaded, it initiates background communication with Twitter's servers and enables real time tracking of user activity.

95.    On the Website's homepage, the Twitter Tracker activates automatically upon page load and begins capturing behavioral data in real time. It records interaction signals such as page views and other engagement events without requiring any user action. The Twitter Tracker actively detects and collects additional user interaction, including click based events and scrolling behavior. These signals are transmitted to Twitter's servers and may be associated with the user's Twitter account, even if the user does not directly interact with any Twitter service while on the Website.

96.    The data collected by the Twitter Tracker supports identity resolution by linking behavioral data from the Website with individual user profiles across Twitter's platforms. If the user is logged into Twitter on the same device or browser, the Twitter Tracker can tie Website behavior to the user's unique Twitter ID. Even if not logged in, Twitter can assign a persistent identifier using cookies, browser fingerprinting, or pixel fire data. This allows the creation of robust cross site behavioral profiles based on a user's activity on the Website.

97.    The Twitter Tracker also serves VIVID's goal of targeted advertising by enabling the creation of custom audiences, groups of users who have taken specific actions on the Website, such as browsing event listings, viewing ticket pages, or beginning a checkout process. VIVID can then use Twitter's Ads Manager to retarget those users across the Twitter platform, or to generate lookalike audiences that mirror the behavioral patterns of existing visitors. These mechanisms allow VIVID to efficiently deliver marketing content to users most likely to engage or convert.

98.    The Twitter Tracker contributes to VIVID's data monetization strategy by turning behavioral insights into measurable advertising return on investment. The Twitter Tracker generates real time analytics regarding user behavior, campaign

CLASS ACTION COMPLAINT

performance, and conversion attribution, which Twitter then delivers to VIVID through its Ads infrastructure. This closed loop feedback system connects on site engagement with offsite ad delivery, allowing VIVID to refine ad spend, personalize messaging, and increase the value of each user interaction. In this way, the Twitter Tracker functions as a core part of VIVID's commercial surveillance infrastructure.

99.    The following figures [**Figure 8** and **Figure 9**] provide technical evidence of the Twitter Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to and/or connections with external tracking domains. These network events occurred automatically and without any user interaction, confirming that the tracking technologies were operating silently in the background without consent.

*Figure 8*



/ / /

/ / /

CLASS ACTION COMPLAINT

***Figure 9***



100.   Defendant surreptitiously installed, executed, embedded, or injected the Twitter Tracker onto users' browsers by dynamically injecting Twitter's JavaScript tracking pixel through a tag management system such as Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Twitter's servers and transmitting metadata including the user's page URL, referrer, browser configuration, and other session specific details. These tracking operations occur without any user interaction, allowing Twitter to collect data from users' sessions silently and without their consent.

101.   The Twitter Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

102.   The Twitter Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

103.   The Twitter Tracker captures and transmits routing, addressing, and signaling information  such as the user's page URL, referrer, and browser metadata  to

CLASS ACTION COMPLAINT

Meta's servers as soon as the page loads, without the user's knowledge or consent. This type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the Website, allowing Twitter to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Twitter without authorization.

104. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Twitter Tracker on Plaintiff's and Class Members' browser or to collect or share data with Twitter.

105. Consequently, the Twitter Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

### 4. *The Segment Tracker*

106. The Segment Tracker is a behavioral tracking script implemented through Segment's analytics and event collection technology, typically delivered via domains such as segment.com or cdn.segment.com. On the Website, the Segment Tracker is inserted using tag management infrastructure. Once loaded, it initiates background communication with Segment's servers and enables real time tracking and collection of user activity and event data.

107. On the Website's homepage, the Segment Tracker activates automatically upon page load and begins capturing behavioral data in real time. It records interaction signals such as page views, button clicks, and navigation events without requiring any user action. The Segment Tracker also detects and collects additional engagement, including click based events and scrolling activity. These data points are transmitted to Segment's servers, where they may be processed and routed to other integrated analytics or marketing services, even if the user does not directly interact with any Segment branded service while on the Website.

/ / /

CLASS ACTION COMPLAINT

108.   The data collected by the Segment Tracker supports identity resolution by aggregating behavioral data from the Website and linking it to individual user profiles if identifiable information, such as email addresses or login credentials, is available. Segment can assign a persistent identifier to users, using cookies, browser fingerprinting, or event based profiles. This approach enables the creation of comprehensive behavioral records and user segments based on activity on the Website.

109.   The Segment Tracker also serves VIVID's goal of targeted advertising and personalized user experience by enabling the creation of custom audiences and behavioral segments. Users who take specific actions on the Website, such as searching for events, viewing listings, or initiating a purchase, can be grouped for remarketing or followed up with tailored messaging. VIVID can use Segment's integrations to send these audience segments to various advertising and email platforms, allowing marketing content to reach users most likely to engage or convert based on their observed behavior.

110.   The Segment Tracker contributes to VIVID's data monetization strategy by transforming behavioral insights into measurable advertising and business intelligence outcomes. It generates real time analytics about user journeys, campaign effectiveness, and conversion attribution, which Segment then delivers to VIVID directly or through connected services. This closed loop feedback system connects onsite engagement data with business performance metrics, allowing VIVID to refine marketing strategies, personalize communications, and increase the lifetime value of user interactions. In this way, the Segment Tracker serves as a core component of VIVID's commercial data collection and analysis infrastructure.

111.   The following figures [*Figure 10*, *Figure 11* and *Figure 12*] provide technical evidence of the Segment Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to and/or connections with external tracking domains. These network events occurred automatically and

CLASS ACTION COMPLAINT

without any user interaction, confirming that the tracking technologies were operating silently in the background without consent.

*Figure 10*



*Figure 11*



CLASS ACTION COMPLAINT

***Figure 12***



112.   Defendant surreptitiously installed, executed, embedded, or injected the Segment Tracker onto users' browsers by dynamically injecting Segment's JavaScript tracking pixel through a tag management system such as Google Tag Manager. When a user visits the Website, the browser automatically executes this script, triggering outbound requests to Segment's servers and transmitting metadata including the user's page URL, referrer, browser configuration, and other session specific details. These tracking operations occur without any user interaction, allowing Segment to collect data from users' sessions silently and without their consent.

113.   The Segment Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

114.   The Segment Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

115.   The Segment Tracker captures and transmits routing, addressing, and signaling information  such as the user's page URL, referrer, and browser metadata  to Meta's servers as soon as the page loads, without the user's knowledge or consent. This

32

CLASS ACTION COMPLAINT

type of metadata reveals the origin and destination of the user's electronic communications. The connection is not initiated by the user, but rather by code embedded in the Website, allowing Segment to intercept and associate those signals with a known or inferred identity. The transmission occurs while the user's communication is still in transit and is diverted to Segment without authorization.

116.　Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Segment Tracker on Plaintiff's and Class Members' browser or to collect or share data with Segment.

117.　Consequently, the Segment Tracker violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**5.**　***The FullStory Session Replay Tracker***

118.　The FullStory Session Replay Tracker is a behavioral tracking script implemented through FullStory's session recording technology, typically delivered via domains such as fullstory.com or cdn.fullstory.com. On the Website, the FullStory script is added using tag management infrastructure or directly embedded in the site's code. Once loaded, it initiates background communication with FullStory's servers and begins capturing all user interactions on the site in real time, including page visits, clicks, scrolls, form inputs, and navigation activity.

119.　On the Website's homepage, the FullStory Session Replay Tracker activates automatically upon page load and immediately starts recording detailed behavioral data. It records every interaction such as mouse movements, taps, clicks, scroll depth, and keystrokes without requiring any user action or additional instrumentation. The FullStory script autocaptures these data points and transmits them securely to FullStory's servers, where the sessions are indexed and made available for later replay and analysis by authorized VIVID personnel.

/ / /

CLASS ACTION COMPLAINT

120.    The data collected by the FullStory Session Replay Tracker supports identity resolution when linked with user account information (such as login IDs or provided emails). FullStory assigns a unique session identifier to each user and can associate past sessions if persistent identifiers are present. This enables VIVID to review complete user journeys and connect different interactions across sessions for a comprehensive understanding of onsite user behavior.

121.    The FullStory Session Replay Tracker also helps VIVID optimize marketing operations. By capturing high fidelity session replays, VIVID can build behavioral segments based on event data, identify friction points, analyze drop offs, and tailor site changes to real user journeys. Integration with other marketing or analytics platforms allows VIVID to correlate session data for advanced targeting and engagement strategies, ultimately driving increased conversion rates and user satisfaction.

122.    Unlike standard analytics tools that aggregate anonymized data, FullStory captures a live reproduction of the user's session, effectively creating a continuous, contemporaneous recording of the user's communications with the website. These intercepted interactions are then transmitted to FullStory's external servers, where they are stored and made accessible to the website operator through a visual playback interface. FullStory acts as an independent third party to the communication, and its involvement is neither visible to the user nor disclosed in a manner that would allow meaningful consent before the interception begins.

123.    The following figures [*Figure 13, Figure 14,* and *Figure 15*] provide technical evidence of the FullStory Tracker being automatically activated during a user's visit to the Website. Each screenshot evidences network activity triggered by scripts embedded in the page source, resulting in HTTP or DNS requests to and/or connections with external tracking domains. These network events occurred automatically and without any user interaction, confirming that the tracking technologies were operating silently in the background without consent.

*Figure 13*



*Figure 14*



/ / /

CLASS ACTION COMPLAINT

***Figure 15***



## VI.    CLASS ALLEGATIONS

124.   Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

125.   **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more.  The exact identities of Class Members can be ascertained by the records maintained by Defendant.

126.   **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between

CLASS ACTION COMPLAINT

Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Defendant intercepted communications with Plaintiff and the Class Members in real-time and transmitted them to FullStory;
- Whether Plaintiff and Class Members are subject to same tracking and interception policies and practices;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;
- Whether the Defendant's conduct violates CIPA; and
- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice.

127. **TYPICALITY:**  As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members.  Plaintiff's experience with the Trackers is typical to Class Members.

128. **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

129. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual

litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

*By Plaintiff and the Class Members Against All Defendants*

130.　Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

131.　Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

132.　Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

133.　Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII. SECOND CAUSE OF ACTION

### Violations of California Penal Code § 631

*By Plaintiff and the Class Members Against All Defendants*

134.　Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

135.　Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

136.　California Penal Code § 631(a) provides, in relevant part:

CLASS ACTION COMPLAINT

"Any person who, by means of any machine, instrument, contrivance, or in any other manner, intentionally taps, or makes any unauthorized connection... with any telegraph or telephone wire, line, cable, or instrument... or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or learn the contents or meaning of any message... or communication while the same is in transit or passing over any wire, line or cable... is guilty of a public offense."

137.   Defendant operates the Website, which and the Class Members Plaintiff visited during the relevant time period.

138.   During Plaintiff and the Class Members' interactions with the Website, Defendant caused to be installed and operated a third-party session replay software known as FullStory, which recorded Plaintiff's communications and interactions with the Website.

139.   The recordings surreptitiously made by Defendant included Plaintiff's mouse movements, clicks, keystrokes, page navigation, and other behavior that comprised private communications between Plaintiff and the Website.

140.   The FullStory technology Plaintiff the Class Members' communications in real-time and transmitted them to FullStory's servers located offsite, without Plaintiff's knowledge or consent.

141.   Defendant did not notify Plaintiff, either through a banner, disclosure, or privacy policy that was presented prior to the interception, that their communications would be recorded, stored, or transmitted to a third party.

142.   FullStory is not a party to the communication between Plaintiff and Defendant. Its interception of communications, at Defendant's direction, constitutes a third-party "eavesdropping" under CIPA § 631.

143.   The interception occurred contemporaneously with Plaintiff's interaction with the Website, satisfying the "while in transit" element of CIPA § 631(a); Defendant caused real-time POSTs to https://rs.fullstory.com/rec/page and rec/bundle/v2 while

CLASS ACTION COMPLAINT

the user session were active, evidencing that user interactions were captured and transmitted during the session, not just stored for later batch processing.

144.   Defendant's actions were willful and intentional, and not the result of mistake or accident; Defendant intentionally caused FullStory to be implemented and configured to intercept real-time communications.

145.   Plaintiff and the Class had a reasonable expectation of privacy in their interactions with the Website and did not consent to the interception and surveillance of their communications.

146.   As a direct and proximate result of Defendant's violations of CIPA § 631, Plaintiff and Class Members have suffered harm, including the loss of their legally protected privacy rights under California law.

## IX.    THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### *By Plaintiff and the Class Members Against All Defendants*

147.   Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

148.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

149.   This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

150.   Defendant has engaged in unlawful business practices by:

(a)  Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking;

(b). Violating California Penal Code § 631, including facilitating the unlawful real-time interception of communications by a third party; and

/ / /

CLASS ACTION COMPLAINT

(c) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice.  Privacy rights rooted in the CCPA are a protected interest enforceable under Business & Professions Code § 17200.  *Briskin v. Shopify, Inc*., 101 F.4th 706 (9th Cir. 2025) (en banc).

151.  Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

152.  The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

153.  Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices.  On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

154.  As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.  Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

155.  Plaintiff on behalf of himself and on behalf of the Class Members seeks

injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA and Business & Professions Code § 17200;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Statutory damages pursuant to CIPA;

6. Prejudgment interest;

7. Reasonable attorney's fees and costs; and

8. All other relief that would be just and proper as a matter of law or equity.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so permitted.


Dated:   August 6, 2025         **NATHAN & ASSOCIATES, APC**


                                By:  /s/ Reuben D. Nathan
                                _____
                                Reuben D. Nathan, Esq.
                                Attorneys for Plaintiff